# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

**GINA A. BOTTOM,**

           Plaintiff,                                Civ. No. 6:13-cv-01106-CL

    v.                                                 **ORDER**

**COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION,**

           Defendant.

---

MARK D. CLARKE, Magistrate Judge.

      Plaintiff Gina A. Bottom ("Plaintiff") seeks judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. This court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). Because the Commissioner's decision is not based on proper legal standards, the decision is **reversed and remanded**.

## BACKGROUND

      Plaintiff was born in May 1965. Tr. 156. Since her early childhood, Plaintiff has endured significant trauma. Tr. 233. She has been the victim of neglect, abuse, and tremendously painful medical procedures. Tr. 230-32. Plaintiff has an eighth grade education and previous work experience as a cleaner, tagger, and fast-food worker. Tr. 163, 168.

On August 12, 2009, Plaintiff protectively filed an application for disability benefits, alleging disability since October 15, 2007 due to "[s]chitoaffective disorder, bi-polar [disorder], PTSD, chronic depression, attachment disorder, migraines (haven't had one for some time, however), [and] diabetes." Tr. 156-57, 162. The Commissioner denied Plaintiff's application initially and upon reconsideration. Tr. 17. At Plaintiff's request, a hearing was held before an Administrative Law Judge ("ALJ") on September 22, 2011. Tr. 17. On December 30, 2011, the ALJ issued a decision finding Plaintiff not disabled. Tr. 17-31. The Appeals Council denied Plaintiff's request for review, rendering the ALJ's denial the Commissioner's final decision. Tr. 1. This appeal followed.

## DISABILITY ANALYSIS

A claimant is disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). "Social Security Regulations set out a five-step sequential process for determining whether an applicant is disabled within the meaning of the Social Security Act." *Keyser v. Comm'r Soc. Sec. Admin.*, 648 F.3d 721, 724 (9th Cir. 2011). Each step is potentially dispositive. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The five-step sequential process asks the following series of questions:

1.    Is the claimant performing "substantial gainful activity?" 20 C.F.R. §§ 404.1520(a)(4)(i); 416.920(a)(4)(i). This activity is work involving significant mental or physical duties done or intended to be done for pay or profit. 20 C.F.R. §§ 404.1510; 416.910. If the claimant is performing such work, she is not disabled within the meaning of the Act. 20 C.F.R. §§ 404.1520(a)(4)(i); 416.920(a)(4)(i). If the claimant is not performing substantial gainful activity, the analysis proceeds to step two.

2.    Is the claimant's impairment "severe" under the Commissioner's regulations? 20 C.F.R. §§ 404.1520(a)(4)(ii); 416.920(a)(4)(ii). Unless

expected to result in death, an impairment is "severe" if it significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1521(a); 416.921(a). This impairment must have lasted or must be expected to last for a continuous period of at least 12 months. 20 C.F.R. §§ 404.1509; 416.909. If the claimant does not have a severe impairment, the analysis ends. 20 C.F.R. §§ 404.1520(a)(4)(ii); 416.920(a)(4)(ii). If the claimant has a severe impairment, the analysis proceeds to step three.

3.      Does the claimant's severe impairment "meet or equal" one or more of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1? If so, then the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(iii); 416.920(a)(4)(iii). If the impairment does not meet or equal one or more of the listed impairments, the analysis proceeds beyond step three. At that point, the ALJ must evaluate medical and other relevant evidence to assess and determine the claimant's "residual functional capacity" ("RFC"). This is an assessment of work-related activities that the claimant may still perform on a regular and continuing basis, despite any limitations imposed by his or her impairments. 20 C.F.R. §§ 404.1520(e); 404.1545(b)-(c); 416.920(e); 416.945(b)-(c). After the ALJ determines the claimant's RFC, the analysis proceeds to step four.

4.      Can the claimant perform his or her "past relevant work" with this RFC assessment? If so, then the claimant is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(iv); 416.920(a)(4)(iv). If the claimant cannot perform his or her past relevant work, the analysis proceeds to step five.

5.      Considering the claimant's RFC and age, education, and work experience, is the claimant able to make an adjustment to other work that exists in significant numbers in the national economy? If so, then the claimant is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(v); 416.920(a)(4)(v); 404.1560(c); 416.960(c). If the claimant cannot perform such work, he or she is disabled. *Id.*

See also *Bustamante v. Massanari,* 262 F.3d 949, 954 (9th Cir. 2001).

The claimant bears the burden of proof at steps one through four. *Id.* at 953. The Commissioner bears the burden of proof at step five. *Id.* at 953-54. At step five, the Commissioner must show that the claimant can perform other work that exists in significant numbers in the national economy, "taking into consideration the claimant's residual functional

Page 3 – ORDER

capacity, age, education, and work experience." *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999); *see also* 20 C.F.R. §§ 404.1566; 416.966 (describing "work which exists in the national economy"). If the Commissioner fails to meet this burden, the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(v); 416.920(a)(4)(v). If, however, the Commissioner proves that the claimant is able to perform other work existing in significant numbers in the national economy, the claimant is not disabled. *Bustamante*, 262 F.3d at 953-54; *Tackett*, 180 F.3d at 1099.

## THE ALJ'S FINDINGS

The ALJ performed the sequential analysis. At step one, the ALJ found Plaintiff had not engaged in substantial gainful activity from her alleged onset date, October 15, 2007, through her date last insured, December 31, 2010. Tr. 19. At step two, the ALJ found Plaintiff suffered from severe impairments: post-traumatic stress disorder (PTSD), anxiety disorder with features of panic, borderline personality disorder, insomnia, polysubstance abuse, and bipolar versus psychoaffective disorder. Tr. 19. At step three, the ALJ found, considered singly and in combination, Plaintiff's impairments did not meet or medically equal any listed impairments. Tr. 20.

Next, the ALJ assessed Plaintiff's residual functional capacity ("RFC"). Tr. 22. He determined she could perform a full range of work at all exertional levels with the following limitations: work of a simple, routine, and repetitive nature which does not require more than reasoning level (RL) 2, does not require public interaction, and involves no greater than occasional interaction with co-workers. Tr. 22. At step four, the ALJ found Plaintiff was capable of performing her past relevant work as a cleaner or tagger or transitioning into other jobs that exist in significant numbers in the national economy, including final assembler, buckle-wire

inserter, and eye glass frame polisher. Tr. 29-30. Therefore, he concluded Plaintiff was not disabled, as defined by the Social Security Act, through her date last insured. Tr. 31.

## STANDARD OF REVIEW

The reviewing court must affirm the Commissioner's decision if it is based on the proper legal standards and the findings are supported by substantial evidence. 42 U.S.C. § 405(g); *see also Hammock v. Bowen,* 879 F.2d 498, 501 (9th Cir. 1989). "Substantial evidence" means "more than a mere scintilla, but less than a preponderance." *Bray v. Comm'r,* 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Andrews v. Shalala,* 53 F.3d 1035, 1039 (9th Cir. 1995)). It means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*

Where the evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld. *Sample v. Schweiker,* 694 F.2d 639, 642 (9th Cir. 1982). Variable interpretations of the evidence are insignificant if the Commissioner's interpretation is a rational reading of the record, and this court may not substitute its judgment for that of the Commissioner. *Burch v. Barnhart,* 400 F.3d 676, 679 (9th Cir. 2005). "However, a reviewing court must consider the entire record as a whole and may not affirm simply by isolating a 'specific quantum of supporting evidence.'" *Orn v. Astrue,* 495 F.3d 625, 630 (9th Cir. 2007) (quoting *Robbins v. Soc. Sec. Admin.,* 466 F.3d 880, 882 (9th Cir. 2006)).

Even where findings are supported by substantial evidence, "the decision should be set aside if the proper legal standards were not applied in weighing the evidence and making the decision." *Flake v. Gardner,* 399 F.2d 532, 540 (9th Cir. 1968). Under sentence four of 42 U.S.C. § 405(g), the court has the power to enter, upon the pleadings and transcript record, a

judgment affirming, modifying, or reversing the decision of the Commissioner, with or without remanding the case for a rehearing.

## DISCUSSION

Plaintiff argues the ALJ erred by: (1) failing to give clear and convincing reasons for rejecting her testimony, (2) placing minimal reliance on the opinion of a treating nurse practitioner, (3) assigning little weight to examining clinicians' opinions and (4) finding Plaintiff retains residual functional capacity to perform her past relevant work as a cleaner or tagger.

### I.   Plaintiff's Testimony

Plaintiff argues the ALJ improperly discredited her testimony. When gauging a claimant's credibility, an ALJ must engage in a two-step process. Tr. 22; 20 C.F.R. §§ 404.1529, 416.929. First, the ALJ must determine whether there is objective medical evidence of an underlying impairment that could reasonably be expected to produce some degree of symptoms. *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996). Second, if such evidence exists, barring affirmative evidence of malingering,[1] the ALJ must give clear and convincing reasons for discrediting the claimant's testimony regarding the severity of the symptoms. *Id.* at 1284; *see also Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007). A general assertion that the Plaintiff is not credible is insufficient. The ALJ must identify what testimony is not credible and what evidence undermines the claimant's allegations. *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993).

The reasons an ALJ gives for rejecting a claimant's testimony must be supported by substantial evidence in the record. *Regennitter v. Comm'r of Soc. Sec. Admin.*, 166 F.3d 1294, 1296 (9th Cir. 1999). If there is substantial evidence in the record to support the ALJ's credibility

---

[1] The ALJ found no evidence of malingering in this case.

Page 6 – ORDER

finding, the Court will not engage in second-guessing. *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002). When the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ. *Tackett*, 180 F.3d at 1098.

Plaintiff testified that she suffers from debilitating insomnia. Tr. 52. She has tried numerous sleep medications but none have helped. Tr. 52, 77. Apart from her insomnia, Plaintiff testified that stress and anxiety interfere with her ability to work. Tr. 53, 57. She suffers from panic attacks about once or twice a month that make her feel as though she is going to die. Tr. 58, 78. She takes multiple medications to manage her stress and attends counseling about twice a week. Tr. 53. Plaintiff cried while testifying and explained that she tends to cry when she is stressed or forced to discuss difficult aspects of her past. Tr. 61. She noted that her inability to sleep adds to her teary affect and stress levels. Tr. 61.

Plaintiff testified that she did not feel capable of functioning properly or following commands in a work setting. Tr. 70. She struggles to concentrate. Tr. 70. She tends to isolate herself and does not feel comfortable with people outside of her immediate family. Tr. 72.

The ALJ found Plaintiff's impairments could reasonably be expected to cause her alleged symptoms. Tr. 23. However, considered in light of the entire record, he found that Plaintiff's statements regarding the intensity, persistence, and limiting effects of her impairments were not credible. Tr. 23. The ALJ gave several specific reasons for this determination. Plaintiff contends they are neither clear nor convincing.

### a. Inconsistencies Between Alleged Inability to Work and Daily Activities

First, the ALJ noted inconsistencies between Plaintiff's alleged inability to work and her reported activity levels. Tr. 23. Contradiction with a claimant's daily living activities is a clear and convincing reason for rejecting a claimant's testimony. *Tommasetti v. Astrue*, 533 F.3d 1035,

1039 (9th Cir. 2008). In her Function Report, Plaintiff recounted playing with her grandchildren, feeding her dog, occasionally taking the dog on short walks, preparing simple meals, doing dishes, doing laundry, vacuuming, making the bed, attending church, going to doctor's appointments, and shopping. Tr. 186-90. In a medical record from January 2008, Plaintiff mentioned that she had been "putting up drywall." Tr. 300. In June 2009, Plaintiff reported that she had increased energy for cleaning after drinking coffee and energy drinks. Tr. 311. The ALJ called these reports "inconsistent with the claimant's alleged inability to work." Tr. 23. However, evidence that Plaintiff is physically capable of performing household chores is not inconsistent with her alleged psychological impairments. *See Smolen*, 80 F.3d at 1284 n.7 ("The Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits, and many home activities may not be easily transferable to a work environment where it might be impossible to rest periodically or take medication."). There is no evidence that Plaintiff's ability to perform home activities at her own pace and discretion would be transferable to a work environment where there are likely external demands and time pressure.

In December 2010, Plaintiff reported to her counselor that she was "overwhelmed with anxiety and panic while shopping with her son the day after Thanksgiving." Tr. 375. The ALJ found the fact that Plaintiff went shopping on Black Friday, the busiest shopping day of the year, was "entirely inconsistent" with her alleged difficulty in public places. Tr. 24. However, the fact that Plaintiff described the experience as panic-inducing tends to confirm, not contradict, her alleged symptoms.

In April 2011, Plaintiff reported to her counselor that she helped care for her granddaughter. Tr. 368. Plaintiff also told the counselor that she was considering moving to California to care for her ill mother. Tr. 368. The ALJ held that Plaintiff's ability and desire to

care for family members were incompatible with her testimony that she struggled to persist in tasks. Tr. 23. He concluded it "indicates that she would be capable of persisting through a normal workday on a regular and continuing basis." Tr. 23. However, the record does not reveal the degree of care that Plaintiff provided for her granddaughter, nor does it suggest that Plaintiff had the actual ability to serve as her mother's full-time caregiver. Simply put, the record does not contain sufficient detail to contradict Plaintiff's testimony. There is no evidence to indicate that Plaintiff performed or could perform caregiving functions at a level commensurate with competitive work.

Accordingly, there is not sufficient evidence to support the ALJ's finding that Plaintiff's daily activities are inconsistent with her alleged impairments. Plaintiff does not claim to be physically limited and, thus, her physical abilities do not invalidate her allegations of psychological impairment. Nor is there sufficient evidence to suggest that Plaintiff engages in activities that are readily transferable to the work setting.

### b. Lack of Candor

Second, the ALJ noted multiple issues that made him question Plaintiff's candor. Inconsistent statements regarding symptoms and other testimony that appears less than candid are valid factors for an ALJ to weigh when determining a claimant's credibility. *Tommasetti*, 533 F.3d at 1039. The ALJ stated that "[t]hough the clamant alleged panic attacks, in November 2009, the claimant reported to Paula Belcher, Ph.D., a consultive examiner, that her 'panic attacks occur about once a month.'" Tr. 23. There is no discrepancy between Plaintiff's testimony and her report to Dr. Belcher. Plaintiff testified that she suffers from panic attacks "once or twice a month depending on my level of, the intensity of my therapy or how I'm feeling

in my body." Tr. 78. In 2009, she told Dr. Belcher that she has panic attacks about once a month. Tr. 239. These two statements support, rather than contradict, one another.

The ALJ interpreted a counselor's note that Plaintiff was "seeking counseling on the forceful recommendation of her physical care physician and her attorney" to mean that Plaintiff did not independently believe that her impairments warranted treatment. Tr. 325, 24. This interpretation is not supported by the evidence. The same counselor's note referenced by the ALJ contains a clear explanation for Plaintiff's apprehension. The counselor noted that Plaintiff "regards the counseling process with a lot of anxiety and is not excited at the prospect of meeting with someone weekly, but does seem to want to work on her problems." Tr. 325. Plaintiff's testimony is entirely consistent with the counselor's note. Plaintiff testified that therapy was forcing her to confront difficult aspects of her past. Tr. 54. "When I go through therapy and we talk about things that have happened and it makes me have nightmares and it brings back flashes," she said. Tr. 61. However, she said that she wanted to feel better and spoke of therapy as a means to that end. Tr. 54, 61.

The ALJ stated Plaintiff painted an "exaggerated picture of her facility with learning new tasks." Tr. 24. Specifically, Plaintiff testified that she did not own a cell phone and did not know how to use one "very well." Tr. 42-43. However, a medical note dated March 31, 2009 described Plaintiff as "computer savvy" and noted that she had downloaded some coupons for sleep medication. Tr. 299. This is not a direct contradiction. It is conceivable that a person could be acquainted with computers but not cell phones. The court will assume it was rational for the ALJ to view these two statements as in potential conflict — one suggesting familiarity with technology and the other denying it. However, this possible discord does not alone constitute sufficient evidence to support the ALJ's negative credibility finding.

The ALJ also questioned Plaintiff's candor because she responded with a simple "no" to his inquiry regarding whether she ever babysits her grandchildren. Tr. 23. The record shows that Plaintiff has cared for her grandchildren in the past. However, it is not clear whether she has done so as the solitary responsible adult or whether others have taken the lead role. Regardless, the ALJ reasonably questioned Plaintiff's honesty given her failure to make clear that she does care for her grandchildren in some capacity.

The ALJ held Plaintiff's alleged inability to find effective treatment for her insomnia was inconsistent with the overall record. Tr. 24. In support of this finding, the ALJ pointed to a May 2009 medical report noting that Plaintiff received some benefit from Ambien, Tr. 295; Plaintiff's husband's statement that Plaintiff's insomnia results from her discontinuation of medication, Tr. 179; Plaintiff's statement that she could not afford Ambien, Tr. 288; the lack of discussion of insomnia in Plaintiff's counseling treatment notes, Tr. 363-376; Plaintiff's caffeine consumption, Tr. 70, 311; and a May 2011 report that Lorazepam was working for her insomnia, Tr. 350.

Only the husband's statement, the May 2011 medical record, and, to a lesser degree, the May 2009 medical report support the ALJ's conclusion. Plaintiff's husband completed a function report on her behalf in which he noted that Plaintiff's condition affects her sleep "when she stops taking her medication." Tr. 179. This indicates that Plaintiff's insomnia is controlled with medication which directly contradicts her testimony. Tr. 52-53, 77. In May 2011, a nurse from Community Health Centers of Lane County noted that "Lorazepam is working for [Plaintiff's] anxiety and insomnia." Tr. 350. However, Plaintiff testified that she did not receive any relief from Lorazepam during the hearing. Tr. 52-53, 77. Similarly, a medical record from May 2009 noted that Ambien marginally helped Plaintiff sleep; however, she failed to testify to that fact. Tr. 295. The ALJ rightly weighed these inconsistencies against Plaintiff's credibility.

In further regards to Ambien, the ALJ found Plaintiff's testimony that it was "a terrible medication" did not agree with the medical record showing her sleep improved while on the drug. Tr. 24. The relevant portion of the referenced medical record states "[t]he Ambien helps her to sleep but it is only four hours and she has difficultly remaining asleep." Tr. 295. Ambien helped, but by no means solved, Plaintiff's sleeplessness. Plaintiff disliked the drug because of its extreme side effects. While on Ambien, Plaintiff sleepwalked and unknowingly engaged in harmful conduct like cutting her own hair, eating uncontrollably, and pulling out a tooth. Tr. 286, 323. Plaintiff's characterization of Ambien as "terrible" is not inconsistent with her recorded experience with the drug. Furthermore, the court does not track the ALJ's reasoning for interpreting Plaintiff's statement that she cannot afford Ambien to imply that she received sleep relief from it. Tr. 24. The record does not support this logical leap.

The ALJ's statement that Plaintiff's counseling treatment notes do not discuss insomnia is not accurate. While the counselor's relatively sparse notes do not use the term "insomnia," the counselor did note that Plaintiff complained about "feeling very tired most of the time." Tr. 366. Furthermore, in her testimony, Plaintiff mentioned that she was seeing one counselor for her PTSD and another, Ayelet Amittay, to address her insomnia. Tr. 74. The counseling notes cited by the ALJ are from Northwest Christian University Counseling Clinic. Tr. 363. Ayelet Amittay is associated with RiverStone Clinic. Tr. 378. Accordingly, Plaintiff gave a sound reason for why Northwest Christian University Counseling Clinic's notes might not detail her sleep issues — she is receiving counseling for her insomnia elsewhere.

The ALJ found that that Plaintiff's caffeine consumption was a "significant factor in her sleeplessness." Tr. 24. The ALJ did not cite to any medical opinions to support this conclusion. Tr. 24. Rather, he referenced a provider's notation that Plaintiff was "drinking more coffee/Red

Bull" and feeling more energy. Tr. 311. The provider who made the note did not indicate any concern with Plaintiff's reported consumption. At the hearing, Plaintiff testified that she drank one cup of coffee in the morning "if that." Tr. 70. Accordingly, neither the medical evidence nor Plaintiff's testimony supports the ALJ's conclusion that Plaintiff is self-creating disruptions in her sleep patterns.

In conclusion, the ALJ rightly questioned Plaintiff's candor based on Plaintiff's failure to clarify that she cared for her grandchildren in some capacity and Plaintiff's failure to specify that her sleepnessness improved at least partially or temporarily with the use of medication. As discussed above, the other reasons given by the ALJ for doubting Plaintiff's honesty are invalid.

### c.  Gaps in Treatment

Third, the ALJ noted that a gap in Plaintiff's treatment indicates her "symptoms are not as severe as alleged." Tr. 24. Specifically, Plaintiff's medical records show that Plaintiff did not seek out medical treatment or medication for her psychological impairments for two years, from March 2007 to March 2009. Tr. 299. Evidence that a claimant has failed to seek or follow a prescribed course of treatment, if not adequately explained, can help justify an ALJ's adverse credibility determination. *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989).

Inability to pay is a valid explanation for a claimant's failure to pursue treatment. *See Orn*, 495 F.3d at 638. Here, the record reveals that Plaintiff has not always been able to afford treatment because she has not had consistent health insurance. Tr. 322-23. However, the ALJ's decision states that "the claimant testified that her health insurance ran out in 2009," thus indicating that her gap in treatment occurred while she was insured. Tr. 24 (emphasis added). This is not an accurate depiction of Plaintiff's testimony. The ALJ did not ask Plaintiff when her health insurance terminated. Rather, he specifically asked whether she had been insured "since

2009." Tr. 47. In response, plaintiff testified that her health insurance ran out <u>before</u> 2009. Tr. 48. It is not clear when precisely this occurred. The ALJ did not offer any support for his assertion that Plaintiff was insured for any portion of time during her gap in coverage. Accordingly, it was inappropriate for the ALJ to discount the possibility that Plaintiff did not pursue treatment because of her financial situation.

In any event, the ALJ noted that Plaintiff was prone to deviate from prescribed courses of treatment and to cease medications after perceiving improvement. Tr. 25. In a third party function report, Plaintiff's husband said "she always stops taking her medication because she thinks she is healed, and gets insomnia for months at a time." Tr. 179. Plaintiff herself acknowledged this tendency. A medical progress note dated May 19, 2009 says "[Plaintiff] reports history of starting medications and then made [sic] to feel by comments by those close to her that she did not need to take them and would stop just as medications were becoming efficacious." Tr. 295. Dr. Belcher noted in her November 2009 psychological assessment of Plaintiff that she "has been non-compliant with medication." Tr. 241. On April 16, 2010, Dr. Christine Jensen-Fox admonished Plaintiff for taking medication without seeking out professional guidance first. Tr. 286. Together, these portions of the record demonstrate that Plaintiff repeatedly deviated from medical guidance without reasonable explanation. The ALJ did not err in taking Plaintiff's noncompliance with medical treatment into consideration.

### d. Success of Treatment

Fourth, the ALJ found Plaintiff's symptoms are generally well controlled with treatment. Tr. 25. The effectiveness of treatment to control Plaintiff's symptoms is relevant to determine the credibility of her representations regarding her symptoms' severity. *See Warre v. Comm'r of the Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006). The ALJ cites to multiple places in the

record where Plaintiff reported improvement with certain drugs. Tr. 25. A May 2009 medical record notes "[Plaintiff] knows the medications are working for her so she is going to continue taking them." Tr. 295. In June 2010, Dr. Jensen-Fox noted that Plaintiff seemed "to be overall doing okay on Prozac with now insomnia being her greatest issue." Tr. 323. Of particular weight, Plaintiff represented in a patient health questionnaire, dated May 19, 2009, that her difficulty with sleeping and concentrating have "not [made it] difficult at all" for her to do work, take care of things at home, or get along with other people. Tr. 312.

The ALJ was right to consider these documented successes. The record indicates that treatment offers Plaintiff some relief. The level and duration of this relief is unclear. However, given plaintiff's habit of deviating from prescribed courses of treatment at the first sign of improvement, it is equally unclear whether the temporary nature of Plaintiff's relief is attributable to inadequate treatment or Plaintiff's noncompliance. Where, as here, evidence is susceptible to multiple rational interpretations, the court may not second guess the ALJ's judgment. *Tackett*, 180 F.3d at 1098. The record supports the ALJ's conclusion that Plaintiff's symptoms are responsive to treatment. Accordingly, he did not err in evaluating this against Plaintiff's credibility.

### c.    Validity of ALJ's Credibility Determination

Some of the ALJ's reasons for discrediting Plaintiff's testimony are valid and others are not. The court need not uphold all of the ALJ's reasons for discrediting Plaintiff in order to affirm the ALJ's ultimate decision so long as substantial supporting evidence remains. *Carmickle v. Comm'r of Soc. Sec. Admin.*, 533 F.3d 1155, 1162 (9th Cir. 2008).

Weighing the ALJ's reasons for discrediting Plaintiff's testimony — omitting those deemed invalid — the court finds that substantial evidence supports the ALJ's decision. Given

Page 15 – ORDER

Plaintiff's less than candid testimony, non-compliance with prescribed courses of treatment, and the apparent effectiveness of treatment to control Plaintiff's symptoms, the ALJ reasonably assigned little weight to Plaintiff's statements regarding her condition.

## II.    Opinion of Treating Nurse Practitioner

Plaintiff argues the ALJ improperly discounted the opinion of a treating nurse practitioner, Ayelet Amittay. In order to reject the testimony of a medically acceptable treating source, the ALJ must provide specific, legitimate reasons based on substantial evidence in the record. *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 692 (9th Cir. 2009). However, nurse practitioners are defined as "other sources," not acceptable medical sources, and are thus entitled to lesser deference. 20 C.F.R. § 404.1513(d); *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012). The ALJ need only give germane reasons to discount Ms. Amittay's opinion. *Molina*, 674 F.3d at 1111.

The ALJ assigned little weight to Ms. Amittay's opinion for three reasons. First, the ALJ held Ms. Amittay's opinion "provides no utility in assessing the claimant's limitations prior to her date last insured" because she did not specify when Plaintiff's symptoms became disabling and she issued her opinion months after Plaintiff's date last insured. Tr. 28. In order to obtain disability benefits, Plaintiff must demonstrate that she was disabled prior to her date last insured: December 31, 2010. *Morgan v. Sullivan*, 945 F.2d 1079, 1080 (9th Cir. 1991); Tr. 17. Any deterioration in Plaintiff's condition subsequent to the eligibility period is irrelevant. *Weetman v. Sullivan*, 877 F.2d 20, 22 (9th Cir. 1989); *Waters v. Gardner*, 452 F.2d 855, 858 (9th Cir. 1971). However, the Ninth Circuit has specifically held that "medical evaluations made after the expiration of a claimant's insured status are relevant to an evaluation of the preexpiration condition." *Lester v. Chater*, 81 F.3d 821, 832 (9th Cir. 1995) (quoting *Smith v. Bowen*, 849 F.2d

Page 16 – ORDER

1222, 1225 (9th Cir. 1988); *see also Barnard v. Comm'r of Soc. Sec. Admin.*, 286 F.App'x 989, 995-96 (9th Cir. 2008) ("testimony is frequently taken after the date last insured due to a significant time lapse between the claim for benefits and the ALJ hearing"). Accordingly, the ALJ was not entitled to reject Ms. Amittay's opinion merely because it was issued in September 2011. Furthermore, the ALJ incorrectly stated that Ms. Amittay failed to specify Plaintiff's disability onset date. Though Ms. Amittay did not precisely pinpoint the date of onset, she did opine that Plaintiff had been disabled for "many years." Tr. 382.

Second, the ALJ found Ms. Amittay's opinion conflicted with her treatment notes which "appear to indicate that the claimant would be capable of performing work within the bounds of the above residual functional capacity." Tr. 28. Inconsistencies between a provider's medical notes and conclusions provide a specific and legitimate — more than just germane — reason for rejecting the provider's opinion. *Tommasetti*, 533 F.3d at 1041. In August 2011, Plaintiff reported to Ms. Amittay that she could perform simple math, and recall with relative ease. Tr. 360. However, in September 2011, Ms. Amittay completed a Mental Residual Function Capacity Report on Plaintiff's behalf in which she noted that Plaintiff was "markedly limited" in her ability to carry out very short and simple instructions. Tr. 382. This incongruency was a germane reason for discounting Ms. Amittay's opinion.

Third, the ALJ noted that Ms. Amittay "appears to have relied upon the claimant's subjective complaints, and the claimant is not fully credible." Tr. 28. An ALJ may reject a medical opinion that is based on a non-credible claimant's self-reports. *Tommasetti*, 533 F.3d at 1041. Because substantial evidence supports the ALJ's finding that Plaintiff's testimony was not fully credible, it was proper for the ALJ to disregard Ms. Amittay's opinion to the extent it hinged on Plaintiff's representations. In conclusion, the ALJ reasonably discounted Ms.

Amittay's opinion for two germane reasons: her opinion displayed inconsistencies with her treatment notes and was based on Plaintiff's discredited subjective complaints.

## III. Opinions of Examining Psychiatrist and Examining Psychologist

Plaintiff argues the ALJ improperly rejected the medical opinions of two examining clinicians: Dr. Michel Farivar, a psychiatrist, and Dr. Belcher, a psychologist. When assessing an ALJ's treatment of medical evidence, the Ninth Circuit distinguishes between treating, examining, and non-examining physicians. An ALJ generally must accord greater weight to a treating physician than a non-treating physician and to an examining physician than a non-examining physician. *Lester*, 81 F.3d at 830. An ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of an examining physician. *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990). If the opinion of an examining physician is contradicted by another physician's opinion, the ALJ must provide "specific, legitimate reasons" for discrediting the examining physician's opinion. *Lester*, 81 F.3d at 830.

In its responsive brief, the Commissioner states that Dr. Farivar and Dr. Belcher's opinions were contradicted by the opinion of a non-examining physician, Dr. Kordell Kennermer. Def.'s Resp., at 13. As such, the Commission argues that the ALJ merely needed to give specific and legitimate reasons for rejecting the clinicians' assessments. Def.'s Resp., at 13. However, the ALJ did not offer this as a reason for discrediting Dr. Belcher and Dr. Farivar's opinions. In fact, far from finding Dr. Kennermer's opinion in conflict with the other two doctor's opinions, the ALJ called Dr. Kennemer's opinion "consistent with the overall record." Tr. 29 (emphasis added). This court must only review reasons provided by the ALJ in his disability determination and may not affirm the ALJ on a ground upon which he did not rely. *Orn*, 495 F.3d at 630. Accordingly, the court will not consider the relationship between the

opinions of Dr. Kennermer, Dr. Belcher, and Dr. Farivar. Since the ALJ did not determine that the clinicians' opinions were controverted, the more rigorous clear and convincing standard applies to his rejection of them.

On November 9, 2009, Dr. Farivar conducted a psychiatric diagnosis assessment of Plaintiff. Tr. 230. Dr. Farivar discussed Plaintiff's spontaneous flashbacks and frequent nightmares of past trauma, sleeplessness, constant anxiety, depression, panic, self-neglect, isolation, moodiness, and hallucinations. Tr. 230, 233. Dr. Farivar described Plaintiff's affect as "tearful and highly anxious." Tr. 233. He diagnosed Plaintiff's symptoms as representative of PTSD, generalized anxiety disorder, and panic disorder. Tr. 234. He stated that further analysis was needed to determine whether Plaintiff also has bipolar disorder, social phobia, or borderline personality disorder. Tr. 233-34. He noted Plaintiff's polysubstance dependence was in partial remission while her alcohol dependence was still active. Tr. 234. Dr. Farivar opined Plaintiff had limited hope for recovery at the time of his evaluation. Tr. 234. He said Plaintiff was a likely candidate for disability benefits because she was "significantly disabled" by her psychiatric symptoms. Tr. 234. However, he conceded that he lacked knowledge regarding Plaintiff's personal resolve to pursue treatment and her receptivity to medication. Tr. 234. He did not entirely foreclose Plaintiff's chance of recovery, noting that Plaintiff's vocational capabilities should be re-assessed once she achieves greater psychiatric stability because "I believe there is still some potential there." Tr. 234. Dr. Farivar gave Plaintiff a Global Assessment of Functioning (GAF) score of 35-40. Tr. 234.

Later that same month, Dr. Belcher conducted a psychological assessment of Plaintiff. Tr. 235. Plaintiff was distressed and tearful throughout the assessment. Tr. 235. Dr. Belcher tested Plaintiff's recollection and concluded that she displayed no significant attention, concentration,

or memory impairments except when she became emotionally distressed. Tr. 236. Dr. Belcher hypothesized that Plaintiff "suffers from hallucinations and delusions with periodic major depressive and hypomanic episodes" as well as PTSD due to past trauma. Tr. 240. She concluded that "[u]ntil such time as this client can maintain emotional stability, she is a poor candidate for the workplace." Tr. 241. Dr. Belcher assessed a GAF score of 40. Tr. 241.

The ALJ "thoroughly reviewed the clinical findings and functional assessments provided by the clinicians" and decided to give "very little weight" to their GAF scores. Tr. 27. He explained that it is not evident to what degree these scores were based on the discredited Plaintiff's representations and, regardless, the GAF scale does not directly correlate to Social Security severity requirements for mental disorder listings. Tr. 27. Beyond the GAF scores, the ALJ did not directly discuss his reasoning for rejecting the clinicians' shared conclusion that Plaintiff's psychological impairments made her a poor candidate for employment. The decision does not indicate that the ALJ weighed these medical opinions when making his ultimate disability determination. On appeal, both Plaintiff and the Commissioner agree that the ALJ did not credit Dr. Belcher and Dr. Farivar's opinions. They disagree as to whether he provided legally sufficient reasons for doing so.

To the extent the ALJ discounted the clinicians' opinions because of their reliance on Plaintiff's statements, his decision is not supported by substantial evidence. An ALJ may properly reject a physician's opinion premised exclusively on a claimant's subjective complaints that the ALJ has already validly discounted. *Fair*, 885 F.2d at 605. However, "an ALJ does not provide clear and convincing reasons for rejecting an examining physician's opinion by questioning the credibility of the patient's complaints where the doctor does not discredit those complaints and supports his ultimate opinion with his own observations." *Ryan v. Comm'r of*

*Soc. Sec.*, 528 F.3d 1194, 1199-200 (9th Cir. 2008). Here, both doctors' opinions were based on their own observations as well as Plaintiff's self-reporting. Dr. Belcher conducted "a survey of the current emotional and mental state" of Plaintiff. Tr. 235. She evaluated Plaintiff's "mood, affect, attention, concentration, and memory." Tr. 235. Similarly, Dr. Farivar performed a mental status examination and recorded his observations of Plaintiff's mood, affect, and demeanor. Tr. 233. Nothing in the record suggests that either clinician disbelieved Plaintiff's description of her symptoms or that the doctors relied on those descriptions more heavily than their own clinical observations. *See Regennitter*, 166 F.3d at 1300 (substantial evidence did not support ALJ's finding that examining psychologists took claimant's "statements at face value" where psychologists' reports did not contain "any indication that [the claimant] was malingering or deceptive"). Accordingly, the ALJ's negative credibility finding for Plaintiff did not undermine the value of Dr. Belcher and Dr. Farivar's professional opinions.

The only other possible reason for rejecting the clinicians' opinions that can be gleaned from the ALJ's decision is Plaintiff's consumption of alcohol. Plaintiff reported to Dr. Farivar that she drank about a bottle of wine a week. Tr. 231. She expressed a desire to stop because she felt it reflected a pattern of substance abuse. Tr. 231. Dr. Farivar stated Plaintiff "needs to stop drinking absolutely" and expressed an interest in evaluating the relationship between Plaintiff's drinking, anxiety, and insomnia. Tr. 234. A few weeks later, Plaintiff reported to Dr. Belcher that she had "promised a doctor a few weeks ago that she would not drink any longer." Tr. 240. The record indicates that Plaintiff maintained that promise. Tr. 289. Plaintiff was no longer drinking alcohol by the time she met with Dr. Belcher. Tr. 289.

Under 42 U.S.C. § 423(d)(2)(C), a claimant cannot receive disability benefits "if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's

determination that the individual is disabled." To ensure compliance with this provision, the ALJ must conduct a drug abuse and alcoholism analysis and determine which of the claimant's disabling limitations would remain if the claimant stopped using drugs or alcohol. 20 C.F.R. § 404.1535(b). If the remaining limitations would still be disabling, then the claimant's drug addiction or alcoholism is not a contributing factor material to his disability. *Id.* If the remaining limitations would not be disabling, then the claimant's substance abuse is material and benefits must be denied. *Id.*

The ALJ did not engage in this analysis. Instead, he informally compared Dr. Farivar's report with a medical record from January 2010. Tr. 26. According to the ALJ, the two records show that Plaintiff "demonstrated significantly improved functioning since attempting to limit the consumption of alcohol." Tr. 26. However, looking at these two records, it is unclear what significantly improved for Plaintiff. The referenced 2010 record discusses Plaintiff's long-term problems with depression, anxiety, and agoraphobia and notes that Plaintiff was tearful during discussion. Tr. 289. This demonstrates continuity with Plaintiff's condition in November 2009, not a departure from it. Indeed, the ALJ himself noted that alcohol's exacerbation of Plaintiff's symptoms was "limited." Tr. 26. Accordingly, substantial evidence does not support the inference that Dr. Farivar's observations did not reflect Plaintiff's genuine condition given her alcohol consumption. What's more, Plaintiff's alcohol consumption did not affect the reliability of Dr. Belcher's opinion in any way since Dr. Belcher saw Plaintiff when she was already abstaining. Accordingly, Plaintiff's relationship with alcohol was not a sufficient reason to discount either doctors' report.

The ALJ committed legal error by failing to articulate clear and convincing reasons for disregarding the medical opinions of Plaintiff's examining physicians. *Cotton v. Bowen*, 799

F.2d 1403, 1408-09 (9th Cir. 1986); superseded by statute on other grounds as recognized in *Bunnell v. Sullivan,* 912 F.2d 1149, 1154 (9th Cir.1990). The error is not harmless because the court cannot confidently conclude that no reasonable ALJ could have reached a different disability determination had the doctors' reports been fully credited. *Stout v. Comm'r, Soc. Sec. Admin.,* 454 F.3d 1050, 1056 (9th Cir. 2006). Accordingly, the ALJ's decision to reject their opinions must be reversed. *Lingenfelter,* 504 F.3d at 1045.

## IV. Residual Functional Capacity to Perform Past Relevant Work

Finally, the Plaintiff contends the ALJ erred in finding she retained the ability to perform her past work as a cleaner or tagger. The ALJ made this finding after instructing a vocational expert on Plaintiff's RFC. The ALJ erroneously discredited two examining clinicians' opinions and thus did not incorporate their conclusions into the RFC or his instructions to the vocational expert. Because it is not clear from the record whether the vocational expert's testimony would have required a disability finding if the clinicians' opinions had been properly addressed, further proceedings are necessary.

## REMAND

"The decision whether to remand a case for additional evidence, or simply to award benefits is within the discretion of the court." *Sprague v. Bowen,* 812 F.2d 1226, 1232 (9th Cir. 1987) (citing *Stone v. Heckler,* 761 F.2d 530 (9th Cir. 1985)). Generally, when a court reverses an administrative decision, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Benecke v. Barnhart,* 379 F.3d 587, 595 (9th Cir. 2004) (quoting *INS v. Ventura,* 537 U.S. 12, 16 (2002)). The issue turns on the utility of further proceedings. A remand for an award of benefits is appropriate when no useful purpose

would be served by further administrative proceedings. *Rodriguez v. Bowen*, 876 F.2d 759, 763 (9th Cir. 1989); *Smolen*, 80 F.3d at 1292.

In some circumstances, where the ALJ has improperly credited testimony or failed to consider it, the Ninth Circuit has credited the rejected testimony. *See Smolen*, 80 F.3d at 1292; *see also Lester*, 81 F.3d at 834. However, in *Connett v. Barnhart*, 340 F.3d 871, 876 (9th Cir. 2003), the Ninth Circuit determined that the "crediting as true" doctrine is not mandatory and the court has some flexibility in applying the doctrine.   On this record, the Court exercises its discretion and remands for further proceedings. *See Stout*, 454 F.3d at 1053–54, 1056–57; *Connett*, 340 F.3d at 876.

## ORDER

Based on the foregoing, and pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner is REVERSED and the matter is REMANDED for further administrative proceedings. The ALJ should:

(1) Review Dr. Farivar and Dr. Belcher's opinions and either accept them as true, applying their contents forward into his RFC determination and instructions to the vocational expert, or properly reject them by presenting clear and convincing reasons.

(2) Make a determination concerning plaintiff's disability application, after conducting the analysis outlined above.

DATED this _30_ day of July 2014.

_____
MARK D. CLARKE
United States Magistrate Judge